IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CANDICE R.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FRANK BISIGNANO, | : | NO.  24-361 |
| Commissioner of Social Security | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                                    April 6, 2026

Plaintiff seeks review of the Commissioner's decision denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").  For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence and affirm the Commissioner's decision.

I.      **PROCEDURAL HISTORY**

Plaintiff applied for DIB and SSI on August 30 and September 13, 2017, respectively, alleging disability as of June 9, 2017, due to neck injury, back injury, leg pain, and arm pain.  Tr. at 477-90, 546.[2]  Her applications were denied initially, id. at 146, 161, and on reconsideration, id. at 179, 195, and she requested an administrative hearing.  Id. at 244-48.  After holding a hearing on August 19, 2019, id. at 103-32, ALJ Mark Hockensmith issued an unfavorable decision on September 4, 2019.  Id. at 202-15.

---

[1]Consistent with the practice of this court to protect the privacy interests of plaintiffs in social security cases, I will refer to Plaintiff using his first name and last initial.  See Standing Order – In re:  Party Identification in Social Security Cases (E.D. Pa. June 10, 2024).

[2]For purposes of her DIB application, Plaintiff was insured through June 30, 2022. Tr. at 39, 540.

The Appeals Council granted Plaintiff's request for review on September 1, 2020, id. at 221-22, and remanded the matter for a new hearing and decision, taking into consideration two medical records that had not previously been considered. Id. Upon remand, ALJ Frederick Timm (hereafter "the ALJ") convened a hearing on May 9, 2022, id. at 56-90, and issued a partially favorable decision on November 1, 2022, finding that Plaintiff was disabled from June 9, 2017, through June 12, 2019. Id. at 35-48. The Appeals Council denied Plaintiff's request for review on November 27, 2023, id. at 1-7, making the ALJ's November 1, 2022, decision the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481. Plaintiff sought review in this court on January 25, 2024. Doc. 1. The matter is fully briefed and ripe for review. Docs. 11-12.[3]

## II.    LEGAL STANDARD

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff has not been disabled since June 13, 2019. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." Zirnsak v. Colvin, 777 F.2d 607, 610 (3d Cir. 2014) (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005));

---

[3]Defendant has consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c), see Standing Order – In Re: Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020), and Plaintiff was deemed to have consented by Order dated January 31, 2024. Doc. 6.

see also Biestek v. Berryhill, 587 U.S. 97, 103 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues.  Schaudeck, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

> 1.     Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.     If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities that has lasted or is expected to last for a continuous period of 12 months;
>
> 3.     If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.     If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and
>
> 5.     If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## III.   DISCUSSION

### A.   ALJ's Findings and Plaintiff's Claims

In his November 1, 2022 decision, the ALJ found at step one that Plaintiff has not engaged in substantial gainful activity since June 9, 2017, her alleged disability onset date. Tr. at 39.  The ALJ found at step two that Plaintiff suffers from the severe impairments of cervical and lumbar degenerative disc disease, major depressive disorder ("MDD"), and generalized anxiety disorder ("GAD").  Id. at 39, 42.  At step three, the ALJ found that between June 9, 2017, and June 12, 2019, Plaintiff's degenerative disc disease met the severity of Listing 1.15, meaning that she was disabled during that period.  Id.

The ALJ concluded that Plaintiff's condition improved and that she no longer suffered from an impairment meeting or equally the severity of the Listing after June 13, 2019.  Tr. at 42-44.  At step four, the ALJ found that since June 13, 2019, Plaintiff has had the residual functional capacity ("RFC") to perform sedentary work, subject to the following limitations: cannot climb ladders, ropes or scaffolds, or crawl; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and reach overhead with the

4

bilateral upper extremities.  Id. at 44.  Plaintiff is also limited to simple, routine tasks, and goal-oriented, rather than production-paced tasks; can engage in frequent but not constant interaction with the general public, supervisors, and co-workers, and requires a stable workplace with few, if any changes of setting, processes, and tools.  Id.  Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could not perform her past relevant work as a general office clerk, weight loss specialist, bank teller, receptionist, or cashier, but could perform the jobs of carving machine operator, stone setter, and lens inserter.  Id. at 46-47.  Thus, the ALJ concluded that Plaintiff's disability ended on June 13, 2019, and she has not become disabled again since that date.  Id. at 48.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ improperly credited the June 12, 2019 opinion of Robert Rinnier, D.O., that Plaintiff would be able to return to work, and failed to credit the assessments of Upkekh Purewal, M.D., that Plaintiff continued to experience pain and limitations after June 13, 2019.  Doc. 11 at 3-5.  Defendant responds that the ALJ properly credited Dr. Rinnier's opinion because it was well supported and consistent with record evidence, including the assessments by Dr. Purewal.  Doc. 12 at 1, 8.

### B.      Plaintiff's Claimed Limitations and Testimony at the Hearings

Plaintiff was born on January 28, 1990, and thus was 27 years of age at the time of her alleged disability onset date (June 9, 2017) and 32 at the time of the relevant ALJ decision (November 1, 2022).  Tr. at 109, 477, 481.  At the time of the first hearing (August 2019), Plaintiff lived with her three-year-old daughter, younger brother, and her boyfriend.  Id. at 109.  By the second hearing (May 2022), she resided only with her

daughter.  Id. at 61.  Plaintiff completed the twelfth grade and has no specialized training.  Id. at 62.  Her past work includes positions as an administrative assistant, recertification clerk, and various retail and service industry jobs.  Id. at 112-13, 547.

At the first administrative hearing on August 19, 2019, Plaintiff testified that she had not worked since she became injured in a car accident on June 9, 2017.  Tr. at 113.  In the early aftermath of the accident, she dealt with severe pain, stress, and depression.  Id.  She immediately began medical treatment, physical therapy, and pain management, in the hopes of returning to work.  Id.  However, even with those treatments, her regular household duties were causing her so much pain that she "couldn't even think about [returning to work]."  Id. at 114.  Plaintiff explained that she underwent surgery to improve her condition, but that surgery was unsuccessful and she never received any relief.  Id. at 115.  She explained that people did not want to be around her because she often complained about her pain.  Id.  Plaintiff also explained that she had trouble standing up and washing dishes and noted in particular that she had to put a chair in the kitchen to enable her to cook a short meal.  Id. at 116.  She also described difficulty picking up her daughter and needing assistance from her mother to take care of her daughter.  Id. at 117.  Plaintiff also testified that she drives short distances, but after 30 minutes she starts to get neck, shoulder, and leg pain, and that driving gives her anxiety.  Id. at 110.

Plaintiff testified that she was then seeing her pain management physician every two weeks for injections, but reported minimal improvement from the injections.  Tr. at 119.  She stated that physical therapy aggravated her symptoms.  Id.  She also explained

6

that she could not stand in line at the store for ten minutes without experiencing pain and feels embarrassed and depressed about her limitations. Id. at 120. She was then taking Percocet and medical marijuana for pain relief, but these medications make her sleepy and impair her concentration. Id. at 121. She rated her pain as an 8/10 on average. Id. at 122. Her typical day was spent on the couch, relaxing, napping or lying down, while her boyfriend takes care of the household chores. Id. She rarely goes shopping, has limited contact with friends and family, and spends time watching television. Id. at 122-24. Prior to the accident, she regularly attended church, exercised, and traveled. Id. at 123-24. She also reported memory problems, difficulty finishing tasks, crying spells, feelings of worthlessness, panic attacks, low energy, and a need for assistance with showering, dressing, and washing her hair. Id. at 125.

At the second hearing on May 9, 2022, Plaintiff testified that she had not applied for jobs since the car accident. Tr. at 64. When asked to describe what has kept her from working, she listed severe pain in her neck and back, that she has confusion and anxiety, up and down mood, difficulty focusing, and that she is scared to drive. Id. She described numbness and spasms in her neck, back, and legs, and shortness of breath, dizziness and fatigue. Id. at 65-66. She testified that she can sit for 20 minutes until her legs start to hurt; can only stand for 10 minutes at a time; can walk about 100 feet before needing to take a break and have a seat; can stand for one hour in an 8-hour day; can lift around 5 pounds, and noted that pushing and pulling and turning her head would be painful. Id. at 66-69. She does not bend, squat, or climb, and weather aggravates her injuries. Id. at 69-70. Plaintiff testified that she typically wakes up around noon, because she cannot sleep

at night due to pain, and then she prepares something to eat before laying on the couch where she drifts in and out of sleep.  Id. at 67-68.  She cooks simple meals using the microwave or air fryer, uses a dishwasher, and the father of her child assists with laundry and grocery shopping.  Id. at 70-71.

The ALJ asked Plaintiff about Dr. Rinnier's records from June 12, 2019, indicating no work restrictions.  Tr. at 78.[4]  Plaintiff responded that she was unaware of Dr. Rinnier's June 12 notation until the ALJ mentioned it and that she continued receiving treatment after that date.  Id. at 78-79.  Plaintiff stopped seeing Dr. Rinnier because her long-term disability benefits ended and her medical coverage shifted to Medicaid.  Id. at 77-79.

A vocational expert ("VE") also testified at the hearing.  Tr. at 81-87.  The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age and education who could perform work consistent with the RFC reference above, supra at 4-5.  Id. at 82-83. The VE testified that this individual could work as a carding machine operator, stone setter, and lens inserter.  Id. at 83.

### C.    Medical Evidence Summary[5]

In April 2012, a little more than five years before the alleged onset of her disability, Plaintiff was involved in a car accident.  Tr. at 675-76.  As a result of the

---

[4]The transcript mistakenly refers to Dr. Rinnier as Dr. Revere, however, the ALJ cited to the medical record which confirms that he was referring to Dr. Rinnier.  Tr. at 46, 78.  There is no Dr. Revere referenced in the record.

[5]Because Plaintiff challenges only the ALJ's findings related to her physical impairments, I limit my review of the medical record to those impairments.

accident, Plaintiff was diagnosed with a left C7 facet fracture, an L4- L5 disc bulge and shallow C4-C5 disc bulge, as well as post-traumatic headaches, temporomandibular joint dysfunction (TMJ), cervical, thoracic, and lumbar strain, bilateral knee contusions, and cervical radiculitis. Id. at 704, 716, 720. She responded well to physical therapy, but obtained little relief from epidural injections. Id. at 715. Several months after the accident, Plaintiff reported difficulty with daily and household activities and applied for New Jersey state disability benefits. Id. at 807-08.

On June 9, 2017, Plaintiff presented to the emergency room following a second car accident, reporting that she had been "rear-ended by a Comcast truck" while stopped at a red light. Tr. at 817-18. Plaintiff complained of neck pain, back pain, and pain in her bilateral lower extremities, with no obvious trauma noted, and was given a cervical collar. Id. at 817. She was prescribed Flexeril, Lidocaine, and Ibuprofen at discharge that same day. Id. at 837.[6]

On June 12, 2017, Plaintiff visited Scott S. Katzman, M.D., at NJ Spine & Orthopedic. Tr. at 858-59. Dr. Katzman diagnosed Plaintiff with intractable neck and low back pain, bilateral upper and lower extremity radiculopathy, right shoulder bursitis and tendonitis, and indicated that he could not rule out herniated discs in the lumbar and cervical spine and rotator cuff tear in her right shoulder. Id. at 859. He observed that

---

[6]Flexeril (generic cyclobenzaprine) is a muscle relaxant. https://www.drugs.com/flexeril.html (last visited Feb. 18, 2026). Lidocaine is a local anesthetic that is used to help reduce pain or discomfort caused by invasive medical procedures. https://www.drugs.com/mtm/lidocaine-injection.html (last visited Feb. 24, 2026).

Plaintiff presented a "complicated case" and prescribed Percocet, Vimovo, and Soma,[7] ordered MRIs of the spine, and opined that Plaintiff was not able to work due to pain. Id.[8]  On June 20, 2017, Dr. Katzman referred Plaintiff for a pain consultation and epidural steroid and facet injections.  Id. at 857.  Plaintiff visited Dr. Katzman on June 21, when she rated her pain as a 9/10 in her neck and back, reported that her neck was stiff, and that she had difficulty with activities and could not work.  Id. at 913.  Dr. Katzman recommended chiropractic and physical therapy and facet block and epidural injections.  Id. at 914.  The doctor observed that Plaintiff might eventually require surgery but first recommended a course of conservative treatment.  Id.

On July 5, 2017, Plaintiff visited Shabnam Shah, P.A., for a pain management consultation.  Tr. at 851-52.  Plaintiff complained of neck and back pain due to the 2017 car accident and reported difficulty sitting, standing, driving, lifting, bending, and caring for family and completing her daily activities.  Id. at 851.  Plaintiff reported that she had partially recovered from the 2012 accident.  Id.  Ms. Shah diagnosed Plaintiff with cervicalgia, low back pain, muscle spasms, intravertebral disc disorders with radiculopathy in the lumbar, thoracic and lumbosacral region, and cervical disorder with

---

[7]Percocet is a narcotic which contains a combination of acetaminophen and oxycodone.  https://www.drugs.com/percocet.html (last visited Feb. 18, 2025).  Vimovo is used to treat symptoms of arthritis and ankylosing spondylitis. https://www.drugs.com/vimovo.html. (last visited Feb. 18, 2026).  Soma (generic carisoprodol) is a muscle relaxer.  https://www.drugs.com/soma.html (last visited Feb. 18, 2026).

[8]Later reference to lumber and cervical MRIs performed in June 2017 indicate that the studies were normal.  E.g., tr. at 1105.

radiculopathy in the cervicothoracic region and high cervical region, and recommended cervical facet joint injections and continued chiropractic treatment.  Id. at 852.

On July 26, 2017, Plaintiff visited Allan Weissman, M.D., at Princeton Surgiplex, who diagnosed Plaintiff with lumbosacral facet syndrome and administered bilateral lumbar facet joint injections.  Tr. at 899-901.  Dr. Weissman reported that Plaintiff received immediate pain relief from the injections.  Id. at 901.

On August 9, 2017, Plaintiff visited Dr. Katzman, where she described her pain as 8 or 9/10.  Tr. at 909-10.  Plaintiff reported that the physical therapy Dr. Katzman had prescribed had made her problems worse, and the lumbar injections gave her only temporary relief.  Id. at 909.  Plaintiff also reported difficulty walking and being unable to work.  Id.  Dr. Katzman diagnosed Plaintiff with intractable neck and back pain, disc protrusion at C5-C6 and L5-S1, and discogenic back pain.  Id. at 910.  He opined that Plaintiff sustained a permanent injury as a result of the accident, and that surgery was medically necessary because conservative treatment had been unsuccessful.  Id.

On August 10, 2017, Plaintiff visited Dr. Weissman, who noted that Plaintiff had decreased range of motion in her cervical and lumbar spine and that Plaintiff rated her pain in those areas as 10/10 and 9/10, respectively.  Tr. at 885.  The doctor once again administered lumbar facet injections and reported that Plaintiff received immediate pain relief from them.  Id. at 887-92.

On September 19, 2017, Dr. Katzman performed neck and back surgery on Plaintiff -- specifically, lumbar discograms, laminotomy, and discectomy, and anterior

11

cervical discectomy and discogram -- and no post-operative complications were reported. Tr. at 911-12.

On October 18, 2017, Plaintiff visited Douglas Slaughter, M.D., at NJ Spine & Orthopedic. Tr. at 903. Dr. Slaughter noted that Plaintiff complained that she was not improving following the surgery, that her pain was unbearable, that she "could not do anything," that her head was too heavy for her neck, and that she was experiencing new pain in her lower extremity. Id. The doctor observed that Plaintiff was "not doing well" and referred her to physical therapy, a psychologist for depression and PTSD, and for medical marijuana. Id.

On October 26, 2017, at a pain management consultation with Eugene Gorman, M.D., Plaintiff rated her pain as 9/10 in midback and lower back. Tr. at 1104. Dr. Gorman recommended a bilateral cervical facet injection and continuing conservative/chiropractic treatment. Id. at 1105.

On November 8, 2017, Plaintiff had a telephone conversation with Dr. Katzman, when she reported no significant improvement in her neck and back pain. Tr. at 924. The doctor recommended pain management including injections, and noted a spinal cord stimulator trial as a potential future treatment. Id.

On November 15, 2017, Plaintiff visited Christopher McCarthy II, M.D., at NJ Spine & Orthopedic. Tr. at 925. Plaintiff reported that her neck pain remained unchanged and that she had not seen pain management or the psychologist to whom she was referred due to insurance issues. Id.

At a visit with Dr. Slaughter on December 13, 2017, Plaintiff reported significant pain in her neck and hands, numbness and tingling, and low back pain and tingling that runs down her thighs and legs, and complained that the surgery did not improve her condition. Tr. at 926. She reported being unable to go to any physical therapy postoperatively and being unable to do regular activities of daily living including driving. Id. Dr. Slaughter assessed that while Plaintiff was doing poorly post-surgery, the amount of pain she was in did not correlate with her surgeries and imaging. Id. The doctor referred Plaintiff to rheumatology for evaluation of possible chronic pain syndrome, fibromyalgia, or other serologic disorder, and added Cymbalta to her medication regimen. Id.[9]

On January 10, 2018, Dr. Katzman noted that Plaintiff continued to report pain and difficulty with activities of daily living. Id. at 927. The doctor recommended Neurontin and a sympathetic block, and opined that Plaintiff might need a spinal cord simulator. Id.[10]

As part of the initial disability determination in November 2017, Plaintiff's medical records were evaluated by Dr. Nancy Simpkins. Tr. at 141-42.[11] Dr. Simpkins identified exertional limitations, though not significant ones, and occasional postural

---

[9]Cymbalta (generic duloxetine) is a selective serotonin and norepinephrine reuptake inhibitor antidepressant (SSNRI) used to treat MDD and GAD. https://www.drugs.com/cymbalta.html (last visited Feb. 18, 2026).

[10]Neurontin is an anticonvulsant drug used to treat nerve pain. https://www.drugs.com/neurontin.html (last visited Feb. 24, 2026).

[11]It is not clear from the record that clinicians Simpkins and Bustos are physicians, but I will refer to them as "Dr."

13

limitations.  Id. at 141-42, 156-57.  On reconsideration, Dr. Deogracias Bustos assessed the same physical limitations as found by Dr. Simpkins.  Id. at 174-75, 190-91.  The ALJ did not discuss the opinions regarding Plaintiff's physical limitations in his decision.

On May 8, 2018, Plaintiff underwent an initial evaluation for chronic pain with Caitlin Innerfield, M.D.  Tr. at 935-37.  Plaintiff complained that she could not even go to the grocery store and that her boyfriend performed all household tasks.  Id.  Dr. Innerfield diagnosed Plaintiff with chronic pain due to trauma, low back pain, cervicalgia, and myalgia.  Id. at 937.  The doctor opined that Plaintiff's pain appeared out of proportion to the physical findings.  Id.  She further observed that Plaintiff was catastrophizing and crying throughout the examination, and that Plaintiff requested to be kept out of work because her orthopedist's work excuse had expired that day.  Id.  Dr. Innerfield declined to extend the work excuse citing a lack of pathology and an examination consistent with myalgia.  Id.

Between January 31 and April 19, 2018, Plaintiff had several physical therapy sessions with John Tocco, DPT, and Justin Ford, SPT, both at FIT Rehab.  Tr. at 948-81. At her initial evaluation, Plaintiff's symptoms were reported as pain, decreased range of motion, decreased strength, and decreased functional mobility.  Id. at 948.  P.T. Tocco described Plaintiff's rehabilitation potential as "good."  Id.  Plaintiff rated her pain as a 7/10, reported that she needed some help, but could manage most of her personal care; could only lift very light weights; had moderate headaches which came frequently; could not do any recreational activities; could hardly read because of severe neck pain; could not work; sleep was moderately disturbed, had great difficulty concentrating, and could

14

hardly drive her car because of neck pain. Id. at 956. Plaintiff was scheduled to receive treatment several times per week but frequently canceled or failed to appear for appointments. Id. at 958-80. She was ultimately discharged from the practice on December 13, 2018, for lack of attendance. Id. at 981. Notes from her sessions consistently listed her rehabilitation potential as "good." Id. at 958, 960, 962, 969, 972, 974, 977.

Between May 18, 2018, and August 27, 2019, Plaintiff was treated by doctors and nurses at Relievus Pain Management, including Drs. Rinnier and Purewal, and Teena Varghese, M.D. Tr. at 984-1064. Until June 12, 2019, the assessments reflected that Plaintiff "may not return to work at this time due to significant pain." See, e.g., id. at 994.[12]

On May 18, 2018, Plaintiff reported her neck and midback pain as 8/10 and lower back pain as 7/10. Tr. at 984. Dr. Rinnier observed that Plaintiff's neck, midback and lower back pain had improved with physical therapy, medications, and rest. Id. The doctor diagnosed Plaintiff with aggravation and exacerbation of preexistent cervicalgia, lumbago and thoracic pain, post traumatic cervical and lumbar radiculopathy, myofascial pain syndrome, and muscle spasm. Id. at 987-88. Plaintiff was then taking Zanaflex and

---

[12]Generally for each of these visits I summarize Plaintiff's pain rating, course of treatment, medication changes, and any new imaging, except for Plaintiff's first and last few visits at the practice, where I also include information from the practitioners' physical examinations.

Percocet.  Id. at 986.[13]  The doctor observed that Plaintiff was moderately distressed due to pain, exhibited moderate tenderness and tightness and moderate pain upon flexion, extension and lateral flexion bilaterally, with a 5-10% reduction in range of motion in her cervical spine.  Id.  She also demonstrated moderate tightness in the thoracic spine.  Id. at 987.  Her lumbar spine had 15-20% reduction in range of motion with moderate to significant tenderness on lumbosacral paraspinal muscles and upon palpation, moderate tenderness on lumbar facet joints from L3 to sacrum bilaterally upon palpation.  Id.  The doctor instructed Plaintiff to continue current conservative treatments, pain medications, and home exercise/stretching.  Id. at 989.

On June 14, 2018, Plaintiff rated her neck and midback pain as 8/10, her lower back pain 8 or 9/10.  Tr. at 990.  The nurse recommended trigger point injections, PENS and ethyl chloride spray and stretching, which she noted was a "more aggressive therapeutic intervention."  Id. at 993.  On July 16, 2018, Plaintiff rated her neck and mid back pain as 9/10 and 8 to 9/10 for lower back pain.  Id. at 996.  The records reflect that Plaintiff was taking Gabapentin in addition to Percocet and Zanaflex.[14]  New imaging revealed disc bulging and herniation, and Dr. Rinnier ordered an EMG study of upper and lower extremities to evaluate for radiculitis, radiculopathy, and neuropathy.  Id. at 998-99.  On August 13, 2018, Plaintiff rated her neck pain as 8/10, midback pain as 7 to 8/10

---

[13]Zanaflex is a short-acting muscle relaxer.  https://www.drugs.com/zanaflex.html (last visited Feb. 18, 2026).

[14]Gabapentin is an anticonvulsant used to treat used to treat partial seizures, nerve pain from shingles and restless leg syndrome.  https://www.drugs.com/gabapentin.html (last visited Feb. 19, 2026).

and lower back pain as 8/10.  Id. at 1006.  Plaintiff's EMG and other electrodiagnostic testing revealed cervical radiculopathy, but no definitive evidence of lumbar radiculopathy.  Id. at 1008-10.

On September 12, 2018, Plaintiff rated her neck pain as 8/10, midback as 7 to 8/10 and lower back pain at 8/10.  Tr. at 1011.  The nurse recommended a midline cervical and lumbar epidural injection for treatment of cervical and lumbar radiculopathy/radiculitis, to be repeated up to three times as needed, and if axial cervical pain persisted after the injection, a medial branch nerve block would be considered.  Id. at 1014.  On October 10, 2018, Plaintiff rated her neck pain as 8/10, midback pain as 7/10, and lower back pain as 8 to 9/10.  Id. at 1017.  With respect to pain management, the nurse ordered a lumbar brace and recommended aggressive therapeutic intervention, similar to what was recommended at the June 14 visit.  Id. at 1022.

On November 29, 2018, Plaintiff rated her neck pain as 6 to 7/10, midback as 6/10, and lower back pain as 7 to 8/10.  Tr. at 1025.  The nurse reported that Plaintiff underwent her first lumbar epidural injection and received about 60 to 70% relief for approximately 1-2 weeks.  Id. at 1025.  Plaintiff visited that same nurse on February 19, 2019, where she reported her neck pain as 7 to 8/10, midback as 5/10, and lower back pain as 7/10.  Id. at 1032.  The nurse noted that Plaintiff underwent her second lumbar epidural injection and received 60 to 70% relief for about a week.  Id.  On April 22, 2019, Plaintiff rated her neck pain as 7/10, midback pain as 4 to 5/10 and lower back pain as 8/10.  Id. at 1039.  The nurse reported that Plaintiff underwent her first interlaminar cervical epidural injection and received about 40-50% relief.  Id.

17

On May 23, 2019, Plaintiff rated her neck pain as 6 to 7/10, her midback pain as 3 to 4/10, and lower back pain as 7/10. Id. at 1046. Plaintiff's range of motion and rotation in her cervical spine was reduced about 20-30% with mild to moderate tenderness and tightness, her lumbar spine had 40-50% reduction in range of motion with moderate tenderness and tightness, and she had mild tenderness and tightness in her thoracic spine. Id. at 1047. The assessment from this visit was co-signed by Dr. Rinnier on June 12, 2019, and notes "addendum made on 6/12/2019, work restriction- none per Dr. Rinnier." Id. at 1051. Records reflect that Dr. Rinier had administered a lumbar epidural injection on Plaintiff the day prior. Id. at 1083.

On July 11, 2019, Plaintiff rated her neck pain as 6/10, midback pain as 3/10 and lower back pain as 6 to 7/10. Tr. at 1053. The nurse noted that Plaintiff had about 70 to 80% relief in lower back pain for approximately 1 to 2 weeks after her lumbar epidural injection. Id. Upon examination, the nurse reported mild to moderate tenderness and tightness on cervical facet joints, mild to moderate pain upon flexion, extension and lateral flexion bilaterally, mild tightness and stiffness and spasm upon palpation of thoracic spine, moderate to significant tenderness on lumbosacral paraspinal muscles, and moderate tenderness on lumbar facet joints. Id. The record for this visit reflected "no work restrictions per Dr. Rinnier," and was co-signed by Dr. Purewal. Id. at 1057-58. On August 9, 2019, Plaintiff was seen by Dr. Rinnier where she rated her neck pain as 7/10, midback pain as 6/10 and lower back pain as 8/10. Id. at 1059. Once again, records reflected "no work restrictions per Dr. Rinnier." Id. at 1063.

18

On August 11, 2020, Plaintiff was discharged from the practice due to insurance issues. Tr. at 1122.  The letter notes that Plaintiff was last seen by the practice that same day, id., however there are no records of that visit or any visit after August 9, 2019.

**D.        Plaintiff's Claims and the ALJ's Opinion**

Plaintiff claims that the ALJ erred in crediting Dr. Rinnier's June 12, 2019 opinion that Plaintiff no longer had any work restrictions, arguing that the doctor's opinion was on an issue reserved to the Commissioner, and that the ALJ failed to discuss and consider subsequent treatment notes which she claims supported ongoing work restrictions.  Doc. 11 at 2, 4.  Specifically, Plaintiff cites a note from Dr. Purewal in July of 2019 that Plaintiff received only 1-2 weeks of relief from the third epidural injection and findings from Dr. Purewal's examination that purport to show continued issues with back and neck tenderness and decreased range of motion.  Id. at 3-4.

The ALJ's consideration of medical opinion evidence is governed by regulations which focus on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.

20 C.F.R. §§ 404.1520c(a); 416.920c(a).[15]  The regulations list the factors to be utilized in considering medical opinions: supportability, consistency, treatment relationship including the length and purpose of the treatment and frequency of examinations,

---

[15]In contrast, the regulations governing applications filed before March 17, 2017, spoke in terms of the weight to be given each opinion, including controlling weight for the opinions of certain treating sources.  20 C.F.R. § 404.1527.

specialization, and other factors including familiarity with other evidence in the record or an understanding of the disability program.  Id. §§ 404.1520c(c), 416.920c(c).  The most important of these factors are supportability and consistency, and the regulations require the ALJ to explain these factors, but do not require discussion of the others.  Id. §§ 404.1520c(b)(2), 416.920c(b)(2).  The regulations explain that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be."  Id. §§ 404.1520c(c)(1), 416.920c(c)(1).  Similarly, "[t]he more consistent a medical opinion(s) . . .  is with the evidence from other medical sources and nonmedical sources . . . , the more persuasive the medical opinion(s) . . . will be."  Id. §§ 404.1520c(c)(2), 416.920c(c)(2).

The ALJ considered Plaintiff's 2022 hearing testimony and the other evidence of record in setting forth his conclusion that Plaintiff's condition improved beginning on June 13, 2019, after which Plaintiff could work subject to the restrictions in the ALJ's RFC.  Tr. at 44-45.  In finding that the record demonstrated no more than mild-to-moderate impairment as of June 13, 2019, the ALJ noted that while Dr. Rinnier had earlier opined that Plaintiff could not return to work, on June 12, 2019,[16] the doctor made a specific addendum, stating that Plaintiff no longer had a work restriction.  Id. at 45.  The ALJ also observed that in July 2019, Plaintiff rated her back pain as 6/10 compared to 9/10 previously, and that her neck pain and range of motion improved with cervical

___

[16]The ALJ mistakenly referred to the date of this addendum as June 13, 2019, rather than June 12, 2019.  Tr. at 44-46.

epidural injections and medications.  Id.  Additionally, the examination from that visit revealed only mild-to-moderate tenderness, and treatment notes from her August 12, 2019 visit indicated that Plaintiff was in only mild distress, with continued findings of mild -to- moderate tenderness.  Id.  Furthermore, the two treatment notes after June 13, 2019, continued to include the notation regarding a lack of work restrictions.  Id.

The ALJ further explained that he found Dr. Rinnier's June 12, 2019 opinion that Plaintiff can return to work persuasive because it was supported by Relievus treatment notes and was consistent with the record, citing the above examples.  Tr. at 46.  He noted that the record contained no evidence of treatment after August 2019, suggesting significant improvement in Plaintiff's condition.  Id.  Although Plaintiff submitted a note from Relievus indicating that she discontinued treatment with them for insurance-related reasons, the ALJ determined that this did not adequately account for the total absence of treatment after August 2019, given the availability of free and low-cost medical services in New Jersey.  Id.[17]

The ALJ properly addressed the supportability and consistency factors in evaluating Dr. Rinnier's opinion, and the resulting conclusions are reasonable.  The ALJ noted that Plaintiff's pain ratings had decreased over the course of her pain management treatments with Relievus, and that objective examination findings reflected reduced tenderness, along with improvement from the injections.  Tr. at 44-46.  Moreover, Plaintiff bears the burden of proving disability.  Poulos, 474 F.3d at 92.  Plaintiff

---

[17]The ALJ took "administrative notice" of the availability of such services.  Tr. at 46.  Plaintiff does not challenge the ALJ's finding in this regard.

submitted no medical record evidence after August 2019, when three recent treatment notes from Relievus had shown improvement and included notation of no work restrictions. In the absence of more recent medical evidence, Plaintiff failed to establish that she remained disabled.[18]

Plaintiff cites findings from Dr. Purewal's July 2019 examination to argue that there was little or no change in her ability to perform work-related activities compared to the period of disability. Doc. 11 at 5. However, Plaintiff references only the portion of the examination addressing Plaintiff's extremities and overlooks the improvement in Plaintiff's lumbar, thoracic, and cervical spine. For example, Plaintiff rated her mid-back pain as 3/10 -- her lowest recorded rating -- and she fails to explain how her 2/4 deep tendon reflex (DTR) findings correspond to any functional work restriction. Tr. at 1053-54. Plaintiff also relies on Dr. Purewal's notes regarding Plaintiff's reported neck pain. Doc. 11 at 3-4. Yet, that same note reflects that Plaintiff rated her neck pain at 6/10 -- again her lowest recorded rating -- and that Dr. Purewal observed that Plaintiff's symptoms were aggravated by twisting, rotational movements, weather changes, and

---

[18]An ALJ may rely on the absence of medical treatment records after a certain date as part of the evidentiary record and may draw limited inferences from that fact, so long as the ALJ considers the plaintiff's explanations or other information in the record that may explain the gap in treatment. See Social Security Ruling 16-3P, Title II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029, at *8 ("We will not find an individual's symptoms inconsistent with the evidence in the record . . . without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints."). The ALJ satisfied the Ruling's requirements by referencing the letter from Relievus that it discharged Plaintiff due to insurance issues, and by observing Plaintiff's testimony that she receives Medicaid.

movement, all of which were accommodated in the ALJ's RFC assessment. Tr. at 1053. Therefore, Plaintiff did not explain how Dr. Purewal's findings contradict Dr. Rinnier's opinion regarding work restrictions -- which were also included in Dr. Purewal's notes from that visit.

As for Plaintiff's contention that the ALJ erred in crediting Dr. Rinnier's opinion because it addressed an issue reserved for the Commissioner, statements on such issues are deemed neither valuable nor persuasive under the regulations. 20 CFR §§ 404.1520b(c)(3); 416.920b(C)(3). These include statements that a plaintiff is or is not disabled, blind, able to work, or able to perform regular or continuing work. Id. §§ 404.1520b(c)(3)(i); 416.920b(c)(3)(i). However, Dr. Rinnier's opinion does not fall within this category. Contrary to Plaintiff's characterization of the opinion as merely stating that she "is able to return to work," Doc. 11 at 4, Dr. Rinnier's opinion of "no work restrictions" is framed in terms of work-related limitations, which is precisely how the regulations define a proper medical opinion. See 20 CFR §§ 404.1513(a)(2), 416.913(a)(2). Moreover, Dr. Rinnier's assessment is probative given his team's treatment of Plaintiff over the course of more than a year.

## IV.    **CONCLUSION**

The ALJ properly evaluated the opinion evidence, and his conclusion that Plaintiff was only disabled during a closed period from June 2017 through June 2019 is supported by substantial evidence. Therefore, I will affirm the Commissioner's decision.

An appropriate Order follows.

23